# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**NATALIE RENEE TOWNSEND,**

      **Plaintiff,**

**v.**                                                  **No. CIV-15-757 LAM**

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

     **THIS MATTER** is before the Court on Plaintiff's ***Motion to Reverse or Remand an Administrative Agency Decision*** (*Doc. 22*) and ***Plaintiff's Supporting Memorandum*** (*Doc. 23*), both filed February 15, 2016 (hereinafter, collectively, "motion").   On April 15, 2016, Defendant filed a response (*Doc. 25*) to Plaintiff's motion and, on May 6, 2016, Plaintiff filed a Notice that briefing was complete (*Doc. 26*).   In accordance with 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(b), the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case.   *See* [*Docs. 16* and *19*]. The Court has considered Plaintiff's motion, Defendant's response, and the relevant law. Additionally, the Court has meticulously reviewed and considered the entire administrative record. [*Doc. 15*].   For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

     .

# I.   Procedural History

On January 18, 2013 (*see Doc. 15-8* at 2), Plaintiff protectively filed an application for Supplemental Security Income (hereinafter "SSI"), alleging that she was disabled due to post-traumatic stress disorder ("PTSD"), bipolar disorder, panic and anxiety disorders, hernia, and hepatitis C (*id.* at 18), with a disability onset date of May 1, 2008 (*Doc. 15-7* at 2).   Plaintiff's application was denied at the initial level on March 28, 2013 (*Doc. 15-5* at 4-8), and at the reconsideration level on July 31, 2013 (*id.* at 12-15).   On September 16, 2013, Plaintiff requested a hearing to review the denial of her application.   *Id.* at 16-17.   Administrative Law Judge Herbert J. Green (hereinafter "ALJ") conducted a hearing on June 16, 2014.   [*Doc. 15-3* at 35-64].   At the hearing, Plaintiff was present, represented by attorney Susan Fox, and testified. *Id.* at 38-55.   Vocational Expert Shelly K. Eike (hereinafter "VE") also appeared and testified. *Id.* at 55-60, 63-64.   On September 23, 2014, the ALJ issued his decision (*id.* at 19-30) finding that, under the relevant sections of the Social Security Act, Plaintiff had not been disabled since January 18, 2013, the date she filed her application (*id.* at 30).   Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id.* at 15.   On June 26, 2015 the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision."   *Id.* at 2.   That decision was the final decision of the Commissioner.   On August 27, 2015, Plaintiff filed her complaint in this case.   [*Doc. 1*].

# II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v.      Astrue*,     522 F.3d 1093, 1096      (10th Cir. 2008)      (citing      *Hamilton v. Sec'y of*

*Health & Human Servs.*,  961 F.2d 1495, 1497–98  (10th Cir. 1992)).    If  substantial  evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision  stands,  and  the  plaintiff  is  not  entitled  to  relief.    *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).    A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.    *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate  to  support  a  conclusion."    *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*,  365 F.3d  at 1214 (citation  and  quotation  marks  omitted); *Doyal*, 331 F.3d at 760 (citation and quotation marks omitted).    An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence  supporting  it."    *Langley*, 373 F.3d  at 1118 (citation  and  quotation  marks  omitted); *Hamlin*,  365 F.3d  at 1214 (citation  and  quotation  marks  omitted).    While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan v. Barnhart*,  399 F.3d  1257, 1262  (10th Cir. 2005) (citations omitted).    "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."    *Lax v. Astrue*,  489 F.3d 1080, 1084  (10th Cir. 2007)  (citing  *Zoltanski v.  F.A.A.*,  372 F.3d 1195, 1200 (10th Cir. 2004)).

### III.   Applicable Law and Sequential Evaluation Process

For purposes of SSI, a person establishes a disability when he or she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).   At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either (3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

### IV.   Plaintiff's Age, Education, Work Experience, and Medical History; and the ALJ's Decision

Plaintiff was born on May 3, 1977, and was 30 years old on May 1, 2008, the alleged onset date of her disability.   [*Doc. 15-7* at 2].   Thus, for the purposes of her disability claim, Plaintiff is considered to be a "younger person."[1]   Plaintiff stated that the highest level of education she had attained was a GED in 1994.   [*Doc. 15-8* at 19].   She can read, write, and understand English. *Id*. at 17.   Prior to filing her disability claim, Plaintiff had worked in a gas station as a stocker/cashier, as a youth care worker in a juvenile center, a child care provider in a daycare center, and as a telemarketer.   *Id*. at 19.   Plaintiff was last employed on July 30, 2008.   *Id*.

Plaintiff's medical records include:   treatment records from Johnston Memorial Hospital for the period from June 20, 2008 through June 29, 2012 (*Doc. 15-11* at 3-94); treatment records from Southwestern Virginia Mental Health Institute for the period from September 11, 2010 through September 22, 2010 (*Doc. 15-23* at 24-54); treatment records from University of Virginia Hospital East for the period from December 8, 2010 through February 2, 2012 (*Doc. 15-9* at 3-40); treatment records from Family Health Care dated May 4, 2012 (*Doc. 15-10* at 5-6); treatment records from Martin County Hospital dated January 6, 2013 (*Doc. 15-13* at 2-23) and March 6, 2013 (*Doc. 15-18* at 6-23); treatment records from Esperanza Health & Dental Centers dated January 15, 2013 (*Doc. 15-13* at 27-30); treatment records from San Angelo Community Medical dated January 22, 2013 (*Doc. 15-14* at 3-20); treatment records from Covenant Medical Center for

----

[1]  *See* 20 C.F.R. § 404.1563(c) (defining a "younger person" as "under age 50").

the period from January 7, 2013 through February 12, 2013 (*Doc. 15-15* at 3 through *Doc. 15-17* at 10); progress notes from P. Douglas Cochran, M.D. dated March 5 and 26, 2013 (*Doc. 15-18* at 35-40); mental RFC assessment by P. Douglas Cochran, M.D. dated April 1, 2013 (*id.* at 43-47); consultative mental examination by Robert W. Federman, Ed.D. dated March 18, 2013 (*id.* at 25-32); treatment records from University Medical Center for the period from April 20, 2013 through April 24, 2013 (*Doc. 15-19* at 2-24); treatment records from Midland Memorial Hospital for the period from February 27, 2013 through May 10, 2013 (*Doc. 15-20* at 3-55); progress notes from Mourad I. Mansour, M.D. for the period from April 2, 2013 through May 7, 2013 (*Doc. 15-19* at 26-27); and treatment records from Scenic Mountain Medical Center for the period from January 6, 2013 through April 10, 2014 (*Doc. 15-21* at 3 through *Doc. 15-23* at 22). Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 18, 2013. [*Doc. 15-3* at 21]. At step two, the ALJ found that Plaintiff has the "severe impairments" of back pain, hepatitis C, peptic ulcer, affective disorder, PTSD, and anxiety. *Id.* The ALJ also found that Plaintiff suffers from the non-severe impairments of "status-post hernia, irritable bowel syndrome, gastroesophageal reflux disease, and substance abuse," which cause her "no more than slight abnormalities," and "would not be expected to interfere with [her] ability to work." *Id.* At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the Listings found in 20 C.F.R. Part 404, Subpt. P, Appx. 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926). *Id.* at 22. In so concluding, the ALJ considered Listings 5.05 (Chronic Liver Disease), 12.04 (Affective Disorders), and 12.06 (Anxiety Related Disorders). *Id.* at 22-23.

With respect to the mental listings, the ALJ found that Plaintiff has mild restriction in activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence or pace, and had experienced one to two episodes of decompensation that were of extended duration.   *Id*.   Before step four, the ALJ found that Plaintiff had the RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b) except [Plaintiff] should be allowed a sit/stand option.  [Plaintiff] can sit and/or stand for a total of eight hours in an eight-hour workday with the choice of changing positions at will, and can perform her work in either position.  [Plaintiff] can occasionally stoop and crouch, but she cannot climb, crawl, kneel or squat.  [Plaintiff] cannot work with the general public, and she can have only superficial contact with coworkers and supervisors.  [Plaintiff] can understand, remember and carry out only simple instructions and she can make simple decisions.  [Plaintiff] can attend and concentrate for extended periods, and she can accept instructions.  [Plaintiff] can respond appropriately to changes in a routine work setting.

*Id*. at 24.   In support of this RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."   *Id*. at 26.

At step four, the ALJ found that Plaintiff "was unable to perform any past relevant work."  *Id*. at 28.   At step five, the ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of unskilled, light work "has been impeded by additional limitations."   *Id* at 29. "To determine the extent to which these limitations erode the unskilled light occupational base," the ALJ asked the VE whether jobs exist in significant numbers in the national economy that Plaintiff can perform, given her age, education, work experience, and RFC.   *Id*.   The VE testified

that Plaintiff could perform representative jobs such as small products assembler (DOT [2] 706.684-022), hand packager (DOT 753.687-038), and small parts inspector (DOT 559.687-074), each of which is considered to be a light, unskilled job with a SVP rating[3] of two (2).  *Id.* at 29.  Therefore, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act "since January 18, 2009, the date the application was filed." *Id.* at 30.

## V.   Analysis

Plaintiff is now 39 years old and has not been employed since 2008.  [*Doc. 15-7* at 10].  Her employment prior to 2008 was intermittent and, typically, brief.  From January 2013 to May 2014, Plaintiff lived with her father and stepmother in Big Spring, Texas.  [*Doc. 15-3* at 40, 44].  In May 2014, she began living with her mother in San Angelo, Texas.  *Id.*  At the time of the hearing in June 2014, Plaintiff's children were living with relatives in Big Spring.  *Id.* at 43.  Plaintiff complains of chronic abdominal and back pain, anxiety, and inability to sleep.  Her medical records contain several reports of pain medication having been denied her on the basis that she chronically seeks narcotics for abdominal pain of unknown cause.  *See, e.g.,* [*Doc. 15-11*

---

[2] "DOT" stands for Dictionary of Occupational Titles.

[3] "SVP" stands for Specific Vocational Preparation, which is a rating of the amount of time it takes "a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   Dictionary of Occupational Titles (4th ed., rev. 1991), App. C(II), 1991 WL 688702.   SVP level 2 jobs require "[a]nything beyond [a] short demonstration up to and including one month" of such preparation.   *Id.*   A job with an SVP rating of 1 or 2 is considered "unskilled work."   POMS-DI-25001.00-B-88, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#b88 (site last visited October 14, 2016).

at 56].   Plaintiff has admitted a past narcotics addiction (*Doc. 15-18* at 28), but testified at the

ALJ hearing that she no longer takes any narcotics (*Doc. 15-3* at 46).

Plaintiff argues in her motion that (1) the ALJ's RFC for Plaintiff is both unsupported by

substantial evidence, and is the product of legal error, because:   (a) limiting Plaintiff to "simple

work" is insufficient to account for her concentration, persistence or pace limitations (*Doc. 23*

at 18-23), and (b) the ALJ did not provide "specific, legitimate reasons" for discounting the

opinion of Plaintiff's treating physician, P. Douglas Cochran, M.D. (*id.* at 23-27); and (2) the

ALJ's credibility determination was erroneous (*id.* at 27-29).   In response, Defendant asserts that:

(1) the ALJ's decision is supported by substantial evidence because:   (a) the RFC properly

accounts for Plaintiff's concentration, persistence or pace limitations (*Doc. 25* at 14-16); and

(b) the ALJ reasonably relied more on the medical evidence than on Plaintiff's subjective

complaints (*id.* at 16-19); and (2) the ALJ properly found that Dr. Cochran's opinion was

inconsistent with the objective medical evidence (*id.* at 19-20).   Plaintiff did not file a reply brief.

## A.   The ALJ's SEP Findings

It is axiomatic in this area of the law that an ALJ who is tasked with determining whether or

not a claimant is disabled for purposes of either disability insurance benefits or supplemental

security income must consider *all* of the evidence that relates to the issue of disability, and must

give reasons for his or her findings, including why specific evidence was rejected.   *See, e.g.,*

*Grogan*, 399 F.3d at 1262 (ALJ must consider all relevant medical evidence in making findings,

and must discuss both the evidence that supports those findings and significantly probative or

uncontroverted evidence that he rejects); 42 U.S.C. § 423(d)(5)(B) (determinations of disability

claims require consideration of all evidence available in the case record).

The ALJ in this case, however, simply parrots the rules for determining disability, along with a statement that he followed those rules--apparently believing that such boilerplate statements render whatever findings follow them legally sufficient.   They do not.   "Although the decision states that the ALJ carefully considered the evidence, it does not actually demonstrate that he did so."   *Armstrong v. Astrue*, 495 F. App'x 891, 893 (10th Cir. August 24, 2012) (unpublished). Claimants are entitled to decisions that objectively consider the evidence and detail the reasons for findings made on that evidence.   Yet the opinion before this Court is a loosely-stitched quilt of boilerplate statements of procedure and law, interspersed with occasional patches of "fact" statements that are not tied to relevant record evidence in any meaningful way.   These general, and not specifically supported, findings begin at step two of the SEP, in which Plaintiff's "severe" impairments are identified.

The ALJ found Plaintiff's "severe impairments" to be "back pain, hepatitis C, peptic ulcer, affective disorder, post[-]traumatic stress disorder, and anxiety."   [*Doc. 15-3* at 21].   However, none of Plaintiff's many medical records appears to support a finding that Plaintiff even has an ulcer,[4] let alone that any ulcer she may have causes "more than a minimal effect on [her] ability to do basic work activities."   *Williams v. Bowen,* 844 F.2d 748, 751 (10th Cir. 1988) (elaborating on the "*de minimis*" standard of severity at step two of the SEP).   Although Plaintiff chronically complained of severe abdominal pain, nausea, and vomiting (including vomiting blood), she was tested for virtually every conceivable condition that could cause her symptoms, and no physical

---

[4] In January 2013, Plaintiff herself denied having any previous ulcer diagnosis.   [*Doc. 15-14* at 11].

condition has ever been identified as "the cause."   Although Plaintiff has been diagnosed with hiatal hernia, GERD, gastritis, and chronic hepatitis C (*see, e.g., Doc. 15-15* at 12-13; *Doc. 15-16* at 2), none of those conditions has ever been considered severe enough to account for Plaintiff's assertions of severe, chronic, and long-term abdominal issues.   Specifically, the medical record does not support even a diagnosis of peptic ulcer, although it may have been considered on occasion as a possible cause of Plaintiff's abdominal pain.   Thus, the ALJ's determination that Plaintiff suffers from a "severe impairment" of peptic ulcer appears to be based entirely on Plaintiff's testimony that "she cannot eat spicy foods," rather than on the medical evidence.[5]   *See* [*Doc. 15-3* at 22, 25].

On the other hand, the ALJ determined that Plaintiff's hiatal hernia was "nonsevere. *Id.* at 21.   Unlike Plaintiff's claimed ulcer, her hiatal hernia is a medically determinable condition, although there appears to be no consensus as to its size.   *See, e.g.,* [*Doc. 15-12* at 10, 29 and *Doc. 15-13* at 6 (small); *Doc. 15-20* at 38 (medium) and *Doc. 15-20* at 21 (moderate); *Doc. 15-20* at 48 (described by Plaintiff as "large")].   There is also evidence, beyond Plaintiff's self-reports, that she had undergone fundoplication[6] surgery at some time prior to 2008, which is when the

---

[5] Interestingly, during his narrative regarding Plaintiff's RFC, the ALJ stated that he gave Plaintiff "the benefit of the doubt" with respect to all of her previously-determined severe impairments, with the exception of back pain and peptic ulcer.   *See* [*Doc. 15-3* at 27].   What exactly that statement was meant to convey is as much of a mystery as is the basis for the ALJ's severity findings.

[6] A hiatal hernia occurs when part of the stomach pushes through the "hiatus," which is an opening in the diaphragm through which the esophagus passes.   A hiatal hernia may cause stomach acid to back-up (or "reflux") into the esophagus, which can damage it.   In fundoplication surgery, the upper curve of the stomach (the "fundus") is pulled over part of the esophagus and wrapped into place.   Thereafter, the lower portion of the esophagus passes through a small tunnel of stomach muscle, which strengthens the valve between the stomach and esophagus that is

medical evidence in the record begins. *See* [*Doc. 15-12* at 10 (noting presence of "fundal wrap")]. Plaintiff informed numerous doctors, and claims in this appeal, that the fundoplication procedure had "failed" and required further surgical intervention. *See, e.g.,* [*Doc. 15-15* at 11; *Doc. 23* at 6-7]. However, at least as of May 2009, the fundal wrap "appear[ed] intact." [*Doc. 15-12* at 10]. Thus, despite Plaintiff's claims, and the fact that she does have a discernable hiatal hernia, there is no evidence that the fundoplication procedure actually "failed."[7] The best evidence of Plaintiff's pain issues is in a report by Elias Ghandour, M.D., a gastroenterologist, regarding an upper gastro-intestinal endoscopy performed on January 8, 2013. [*Doc. 15-16* at 2 through *Doc. 15-17* at 5]. Dr. Ghandour noted "[d]iffuse moderate inflammation . . . in the entire examined stomach," and took several biopsies. [*Doc. 15-16* at 2]. His "impression" was that the exam revealed "LA Grade B reflux esophagitis,"[8] "[h]iatus hernia," and "[g]astritis," and he recommended awaiting the biopsy results and that Plaintiff "[f]ollow an antireflux regimen

_____

supposed to prevent acid reflux from happening. Fundoplication is most often used to treat GERD, which is likely to be caused, at least in part, by a hiatal hernia. If the patient has a hiatal hernia, it will be repaired during the fundoplication surgery. http://www.webmd.com/heartburn-gerd/fundoplication-surgery-for-gastroesophageal-reflux -disease-gerd (site last visited October 14, 2016).

[7] In her motion, Plaintiff claims that Scenic Mountain Medical Center treatment notes indicate that her "pain is all directly related to a hiatal hernia that she needs repaired." [*Doc. 23* at 8 (quoting *Doc. 15-21* at 53)]. While this quote is correct, representing it as coming from Scenic staff is misleading, since it is quite clearly information that Plaintiff herself provided in her medical history. *See* [*Doc. 15-21* at 53 (noting "History obtained from: patient")]. A more credible source for Plaintiff's potential need for hernia surgery would have been Nicki L. Colbert, D.O., who recommended, on February 12, 2013, "a surgical evaluation regarding potential surgical options for hiatal hernia." [*Doc. 15-15* at 13]. However, even Dr. Colbert's recommendation appears to have been based on Plaintiff's own "history" statements to the effect that she had undergone a fundoplication surgery in 2002 that had "failed." *Id.* at 11.

[8] Esophagitis is inflammation of the lining of the esophagus, and is usually caused by acid reflux. http://patient.info/health/acid-reflux-and-oesophagitis (site last visited October 14, 2016). Grade B esophagitis on the Los Angeles grading scale indicates that the esophagus has "one or more mucosal breaks more than 5 mm long, none of which extends between the tops of two mucosal folds." The four-grade "LA" scale is least symptomatic at Grade A, and most symptomatic at Grade D. http://patient.info/doctor/gastro-oesophageal-reflux-disease (site last visited October 14, 2016).

indefinitely." *Id*.   The biopsies themselves revealed "no significant histopathologic changes." [*Doc. 15-17* at 4].   Despite all of this evidence, the ALJ determined that Plaintiff's non-medically determinable peptic ulcer was an impairment that caused more than a minimal effect on her ability to work (*Doc. 15-3* at 21), while her medically determinable hiatal hernia did not (*id*.).   Although an explanation of the evidence upon which the ALJ relied in making these findings was most certainly called for, he failed to provide one.

The ALJ's finding that Plaintiff's hepatitis C is a severe impairment appears equally unfounded.   *Id*.   Plaintiff tested positive for hepatitis C on at least one occasion, but it is not clear that she suffered any work-related effects from that condition.   *See, e.g.,* [*Doc. 15-14* at 11 (noting that Plaintiff had a history of hepatitis C "without treatment")].   This condition, which Plaintiff reported to have first been diagnosed in the spring of 2010 (*Doc. 15-9* at 13), was specifically viewed at one point to have the potential to spontaneously resolve (*id*. at 13).   Thus, although Plaintiff's hepatitis C is a medically determinable condition, there is no evidence that it has ever led to any impairment of her ability to perform work functions.

The ALJ also found that, although Plaintiff "has a history of substance abuse," her "substance use disorder is not a contributing factor material to the determination of disability." *Id*. at 22.   In so finding, the ALJ noted that Plaintiff had "admitted to previously being addicted to [h]ydrocodone,"[9] but that she was "currently not taking [h]ydrocodone or other similar pain

---

[9] Hydrocodone is considered an 'opioid' and is derived from codeine   Hydrocodone works by binding pain receptors in the central nervous system, which weakens the signal for pain in the brain and can produce feelings of

medications." *Id*.   The sole basis given by the ALJ for this finding was a psychological report

prepared by consulting examiner, Robert W. Federman, in its entirety.   *See* [*Doc. 15-18* at 26-32].

This report, which resulted primarily from Dr. Federman's interview of Plaintiff and her mother in

March 2013, states that Plaintiff "has been on Xanax,[10] to which she was addicted, on and off for

a long time.   She also has taken Ativan[11] and pain medications, particularly [h]ydrocodone[,]

which she became addicted to[,] but she is currently off these drugs."   *Id*. at 28.   Significantly,

however, this statement appears in the "History" section of Dr. Federman's report, which he

prefaced with the statement that "[h]istory was easy to obtain in that both mother and examinee

spoke clearly and were very disclosing."   *Id*. at 27.   Later in the History section, Dr. Federman

includes both Xanax and Lortab[12] in Plaintiff's list of "Current Medications," noting that Plaintiff

admitted to both Xanax and Lortab addiction, and that she "is trying to reduce the dosages or get

_____

elation.   Hydrocodone abuse can be difficult to recognize, but includes use beyond the recommendation (e.g., taking more pills than prescribed, continued use beyond the prescription time frame, or using for reasons not intended). https://www.addictioncenter.com/painkillers/hydrocodone/ (site last visited October 14, 2016).   Hydrocodone is a Schedule II controlled substance, which means it has "a high potential for abuse, with use potentially leading to severe psychological or physical dependence."   Schedule II drugs "are also considered dangerous." https://www.dea.gov/druginfo/ds.shtml (site last visited October 14, 2016).

[10] Xanax (generic name "alprazolam") is in a class of medications called benzodiazepines, which are central nervous system depressants.   It is often used to treat anxiety and panic disorders, and works by decreasing abnormal excitement in the brain.   Xanax may be habit-forming, and sudden stoppage of it may lead to withdrawal symptoms, including cramps, diarrhea, vomiting, pain, or decreased appetite.   https://medlineplus.gov/druginfo/meds/a684001.html (site last visited October 14, 2016).   Xanax is a Schedule IV controlled substance, which are "defined as drugs with a low potential for abuse and low risk of dependence."   https://www.dea.gov/druginfo/ds.shtml (site last visited October 14, 2016).   Plaintiff's 12-day hospitalization in 2010 was due, in-part, to opioid and sedative hypnotic withdrawal.   *See* [*Doc. 15-23* at 41, 44].

[11] Ativan (generic name "lorazepam") is, like Xanax, a benzodiazepine used to relieve anxiety. https://medlineplus.gov/druginfo/meds/a682053.html (site last visited October 14, 2016).   Ativan is also a Schedule IV controlled substance.   https://www.dea.gov/druginfo/ds.shtml (site last visited October 14, 2016).

[12] Lortab is a pain-relieving medication that is a combination of acetaminophen and hydrocodone. https://medlineplus.gov/druginfo/meds/a601006.html (site last visited October 14, 2016).

off these meds." *Id*. at 29.   In the "Formulation" section of his report, Dr. Federman states that Plaintiff's social functioning, which he described as "quite withdrawn and reclusive," had been "very adversely affected by her past sexual abuse," for which she had never received any significant counseling, and thus "appears dependent on medications to deal with her problems in this regard.   Some of the medications are addictive and she has become addicted to them after long use.   This, in and of itself, is another problem for her."   *Id*. at 31-32.

Considered together, Dr. Federman's statements in his report are not supportive of a finding that Plaintiff was no longer taking or abusing additive substances in March 2013. Moreover, there is abundant record evidence that suggests that when Plaintiff was interviewed by Dr. Federman she was in fact taking, and possibly abusing, narcotic pain medication.   For example, on March 3, 2013, a urine toxicology screen performed at Scenic Mountain Medical Center (hereinafter "Scenic") was positive for barbiturates, benzodiazepines, and opiates. [*Doc. 15-22* at 21].   On March 12, 2013, a patient history from Scenic indicates that Plaintiff's medications included both Xanax and hydrocodone (*id*. at 9), and she received an injection of morphine while there (*id*. at 13).   At Martin County Hospital, on March 6, 2013, Plaintiff received two intravenous doses of Demerol[13] and one of morphine (*Doc. 15-18* at 16), and was then transferred to Midland Memorial Hospital (hereinafter "Midland"), where she received three

---

[13] Demerol (generic name "meperidine") is an opiate pain medication that can, like hydrocodone, be addictive.   https://medlineplus.gov/druginfo/meds/a601155.html (site last visited October 14, 2016).   Demerol is a Schedule II controlled substance.   https://www.dea.gov/druginfo/ds.shtml (site last visited October 14, 2016).

intravenous doses of hydromorphone[14] (*Doc. 15-20* at 37).   Plaintiff was treated at Midland twice more in March and, at both subsequent visits, Plaintiff received intravenous doses of both morphine and hydromorphone.   *Id*. at 14-15, 27.

Plaintiff's narcotic dependence continues beyond March 2013, as well.   On April 20, 2013, another urine toxicology screen at Scenic tested positive for amphetamines, benzodiazepines, and marijuana, but negative for opiates.   *Id*. at 43.   Additionally, on May 1, 2013, approximately six weeks after Dr. Federman's interview of her, Plaintiff was treated at Scenic for an overdose of both opioids (which include hydrocodone) and benzodiazepines (which include Xanax).[15]   [*Doc. 15-21* at 3].   Her continued narcotic usage is also documented in the record on April 10, 2014--only about two months prior to the ALJ hearing.   At that time, Plaintiff presented at Scenic with complaints of severe headache and back pain, and received two injections of Demerol and prescriptions for, among other things, Lortab.   [*Doc. 15-23* at 5, 8-10].   Despite her receipt of this treatment, Plaintiff testified at the June 2014 hearing that the only medication she took was "ibuprofen for inflammatory" and that she "[did not] want to take anything different

---

[14] Hydromorphone (brand name "Dilaudid") is an opiate pain medication derived from morphine that can, like hydrocodone, be addictive.   https://medlineplus.gov/druginfo/meds/a682013.html (site last visited October 14, 2016).   Hydromorphone is a Schedule II controlled substance.   https://www.dea.gov/druginfo/ds.shtml (site last visited October 14, 2016).

[15] It bears noting that there is an eleven-month gap in Plaintiff's medical records, from May 10, 2013, when she was treated at Midland for a fall in her bathtub (Doc. 15-20 at 4), until April 10, 2014, when she was treated for a fall from a moving truck at Scenic (*Doc. 15-23* at 4).   In fact, there is only one documented medical treatment for Plaintiff in the record between May 2013 and the ALJ hearing on June 16, 2014.   In light of Plaintiff's otherwise nearly continuous medical treatment, this gap is troubling.

than that," including medications for her psychological issues.[16]   [*Doc. 15-3* at 46].   Plaintiff

also testified that she had not received any medical treatment "over the last year."[17]   *Id*. at 42.

In light of this evidence, which does not even begin to cover Plaintiff's significant pain and

narcotics history, it is nearly inconceivable that the ALJ could find, as he did, that Plaintiff was

"currently not taking [h]ydrocodone or other similar pain medications," or that her "substance use

disorder is not a contributing factor material to the determination of disability."   *Id*. at 22.

Moreover, the only basis given by the ALJ for such findings was a report that does not support

them, was outdated for purposes of Plaintiff's "current" status at the time of the hearing and, even

if interpreted as supportive of the ALJ's findings, would be at odds with substantial antecedent and

subsequent medical evidence to the contrary.[18]

These issues with the ALJ's decision carry-over into step three of his SEP, as well.   In

considering mental impairment listings 12.04 and 12.06, the ALJ found that Plaintiff has "mild

---

[16] The ALJ did not refer to this testimony in his finding that Plaintiff was no longer taking hydrocodone, nor did he question Plaintiff's testimony that she had not obtained any medical treatment at all within the previous year (*Doc. 15-3* at 42), despite the numerous medical reports dated during that time period in the record (*e.g., Doc. 15-23* at 8-19 (April 10, 2014)).

[17] This fairly obvious discrepancy was not discussed by the ALJ, either with respect to Plaintiff's credibility, or otherwise.

[18] A medically determinable substance abuse disorder must be ruled out as a "material" contributing factor to a claimant's disability before the claimant can be found "disabled" for the purposes of SSI.   Soc. Sec. Rep. 13-2P, 2013 WL 621536, at *4 (February 20, 2013).   A materiality determination must be made if a claimant is found to both have a substance abuse disorder and to be disabled, when all impairments including the substance abuse are considered.   *Id*.   If these two prerequisites are met, the ALJ must perform a second SEP to determine whether or not the claimant would be disabled absent the substance abuse (*i.e*., whether claimant's other impairments are disabling by themselves).   *Id*. at *6.   Under these guidelines, it is not clear that the ALJ's cursory statement at step two that Plaintiff's "substance use disorder is not a contributing factor material to the determination of disability" (*Doc 15-3* at 22) is sufficient.

restriction" in her activities of daily living, and "moderate difficulties" in both social functioning and concentration, persistence or pace.   [*Doc. 15-3* at 22-23].   These findings are based entirely on the medical opinions of Dr. Federman and Thomas Geary, Ph.D., a non-examining expert at the reconsideration review level.[19]   *Id*.   With respect to activities of daily living, the ALJ stated that he had "given [Plaintiff] the benefit of the doubt but finds that [she] has no more than a mild limitation in this area," based on findings that she "attends to her personal hygiene, reads and cooks" and that she "also shops, dusts, washes laundry and dishes."   *Id*. at 22 (citing Dr. Federman's report).   Oddly, the ALJ also includes the statement that Plaintiff "lives and gets along with her mother and stepfather" as support for his assessment that she has only mild limitations in activities of daily living.   *Id*. (again citing Dr. Federman's report).[20]

The ALJ also relied on Dr. Federman's statement that Plaintiff "gets along with" family members in his assessment of Plaintiff's social functioning.   However, Dr. Federman conclusion was that Plaintiff's "social functioning appears to be very adversely affected by her past sexual abuse when she was a child by [a different] stepfather.   In the meantime she has become quite withdrawn and reclusive and this tendency is intensifying as she continues to avoid being involved

---

[19] Dr. Geary's mental RFC for Plaintiff is identical to that of Janice Ritch, Ph.D., who was the medical expert at the initial Administration review.   *See* [*Doc. 15-4* at 11-14 and 29-31].   Therefore, in this decision, references to Dr. Geary's opinion include the opinion of Dr. Ritch.

[20] Dr. Federman did indeed report that Plaintiff lived with her mother and stepfather in March 2013, and that she "gets along fine with her stepfather" and "gets along well with her family."   [*Doc. 15-18* at 29].   However, at the ALJ hearing in June 2014, Plaintiff testified that she lived with her father and stepmother from January 2013 until May 2014, which is when she moved in "with [her] mother."   [*Doc. 15-3* at 40].   Whatever her actual living situation was, however, "getting along" with others is not typically an "activity" that would indicate that a claimant is able to physically function more or better than she contends..

in society."   [*Doc. 15-18* at 31].   The ALJ did not discuss this portion of Dr. Federman's report,

instead relying on Dr. Geary's opinion that Plaintiff had "moderate" social functioning difficulties.

Although Dr. Federman did not express his opinion of Plaintiff's social functioning in terms of

"mild, moderate, or marked," his narrative suggests that he would consider Plaintiff to have more

than "moderate" difficulties.   In addition, it is significant that Dr. Federman was an *examining*

medical expert, whereas Dr. Geary was not.   *See Robinson v. Barnhart*, 366 F.3d 1078, 1084

(10th Cir. 2004) (examining physician's opinion is generally entitled to less weight than that of a

treating physician, and "the opinion of an agency physician who has never seen the claimant is

entitled to the least weight of all").   Therefore, in the event of a conflict, Dr. Federman's opinion

should have been given greater weight than that of Dr. Geary unless "good reasons" were given for

not doing so.   Here, however, no reasons were given as the ALJ routinely failed to discuss

contrary opinions.[21]   This constitutes the kind of "picking and choosing" of evidence to support

the ALJ's own opinion or outcome that has been repeatedly deemed grounds for reversal.   *See,*

*e.g., Haga v. Astrue*, 482 F.3d 1205 (10th Cir. 2007).

---

[21] Indeed, the ALJ did not even mention the contrary opinion of treating doctor, Dr. Cochran, regarding Plaintiff's social functioning and concentration, persistence or pace.   Unlike Dr. Federman, whose opinions appear only in narrative format, Dr. Cochran specifically identified Plaintiff's limitations in a function-by-function manner. *See* [*Doc. 15-18* at 43-47].   With respect to social interaction, Dr. Cochran indicated that Plaintiff had "marked" or "extreme" limitations in seven out of nine functions, and "moderate" limitations in two.   *Id*. at 46-47.   Regarding Plaintiff's concentration, persistence or pace, Dr. Cochran indicated that Plaintiff had marked or extreme limitations in all eleven functions.   *Id*. at 45-46.   This evidence should have been addressed by the ALJ in his narrative at step three.

In his RFC analysis, the ALJ indicated that he gave "significant weight" to the opinion of consultative examiner Robert Federman, Ed.D., "due to the examiner's expertise and thorough examination of [Plaintiff]," and because he found that opinion to be "supported by a majority of the objective medical evidence."   [*Doc. 15-3* at 28].   Conversely, the ALJ gave "little weight" to the opinion of P. Douglas Cochran, M.D.,[22] whom he described as "one of [Plaintiff]'s physicians," on the grounds that Dr. Cochran's opinion was "not supported by a majority of the objective medical evidence," and "the issue of disability is reserved to the Commissioner."   *Id*. The ALJ also gave "significant weight" to the state agency non-examining psychological consultants at the initial and reconsideration review levels, Drs. Ritch and Geary, respectively, "due to the consultants' program expertise and thorough review of the evidence of record," and his finding that those opinions "are supported by a majority of the objective medical evidence."   *Id*. at 27.   Finally, the ALJ gave "little weight" to the state agency non-examining physical consultants, Hajra Madani, M.D. and Betty Santiago, M.D., at the initial and reconsideration levels, respectively, because they each concluded that Plaintiff "was capable of performing medium exertional work," whereas the ALJ himself determined that "a majority of the objective medical

---

[22] An ALJ's assignment of "little weight" to a medical opinion may be interpreted as "effectively rejecting" it.  *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).   In this case, the ALJ's assignment of "little weight" to Dr. Cochran's opinion does appear to effectively reject it.

evidence indicated [Plaintiff] was only capable of performing light level exertional work."[23]   *Id.* at 27-28.

Unfortunately, the statements of the weight assigned by the ALJ to the few medical opinions that were presented are devoid of substantive content from which this Court can even attempt to determine their merit.   They are simply boilerplate statements, repeated in one decision after another, with occasional tweaks to make them fit the facts of the current case.   Significantly, however, such boilerplate is insufficient to support an ALJ's findings.   The Tenth Circuit defines "boilerplate" as "conclusory analysis, which neither reveals what other reasons or other factors prompted the ALJ's conclusions, nor is tethered to specific evidence," but notes that "use of such boilerplate is problematic only when it appears in the absence of a more thorough analysis." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1170 (10th Cir. 2012) (internal citations and quotation marks omitted).   Here, the ALJ's weight assessments are wholly without *any* further analysis.

The assessments also violate what is commonly known as the "treating physician rule." *Langley*, 373 F.3d at 1119.   That rule dictates that an opinion from an acceptable medical treating source that is both "well-supported and not inconsistent with other substantial evidence in the case record, [] must be given controlling weight, i.e., it must be adopted."   Soc. Sec. Rep. 96-2P, 1996 WL 374188, at *1.   Thus, an ALJ's decision is required to "give good reasons" for the

---

[23] The basis for the ALJ's finding that Plaintiff could only perform light work was neither explained nor tied to the record evidence.   Indeed, rejecting the agency physicians' opinions left the ALJ with no physical RFC medical opinions upon which he could have relied.

weight assigned to a treating source's medical opinion, which must be specific enough "to make clear to any subsequent reviewers the weight the [ALJ] gave . . . and the reasons for that weight." *Id*. at \*5.   Additionally, a finding that a treating source opinion does not satisfy both the "well-supported" and "not inconsistent" requirements "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected," because such opinions "are still entitled to deference."   *Id*. at \*4.   The amount of weight assigned to a non-controlling weight treating source opinion is determined by considering all of the factors set forth in 20 C.F.R. 404.927, which are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley*, 373 F.3d at 1119.   In this appeal, Defendant proposes several reasons why the ALJ's dismissal of Dr. Cochran's opinion should be upheld.   *See* [*Doc. 25* at 16-20].   For example, Defendant asserts that "it is not clear that Dr. Cochran is a treating physician," based on what is described as a "fleeting relationship."   *Id*. at 19.   While this position may have some merit, it was not asserted by the ALJ in support of his rejection of Dr. Cochran's opinion, nor were any of Defendant's other appellate arguments.   Significantly, "points that the ALJ perhaps could have made, but did not" are considered to be "post-hoc reasoning," which is insufficient to overcome a failure to state specific reasons for the weight assigned to medical source opinions.   *Ringgold v. Colvin*, __ F. App'x __, 2016 WL 1297817, at \*4-5 (10th Cir. April 4, 2016) (unpublished).   In addition, as already noted, a finding that a treating source's opinion is not entitled to controlling

weight does not end the analysis, as there must still be an evaluation of the weight the opinion should be given, based on consideration of the regulatory factors.   Here, the ALJ apparently considered Dr. Cochran to be a treating source, calling him "one of [Plaintiff]'s physicians," and referring to the treating physician rule.   [*Doc. 15-3* at 28].   However, the ALJ did not discuss how he had determined that Dr. Cochran's opinion was not entitled to controlling weight, nor did he even discuss the regulatory factors in assessing what weight it should receive.   Even more significantly, the ALJ did not tie his decision to reject Dr. Cochran's opinion to *any* inconsistent objective medical evidence, as he is required to do.   Defendant may not supply that reasoning for the ALJ at this point in the process.

### B.   The ALJ's Limitation of Plaintiff to Simple Work

Included in the ALJ's RFC is a limitation that Plaintiff "can understand, remember and carry out only simple instructions and she can make simple decisions."   [*Doc. 15-3* at 24]. Plaintiff contends that limiting Plaintiff to "simple" work "fails to express moderate limitations in concentration, persistence, or pace," and is therefore legal error.   [*Doc. 23* at 18 (citing *Jaramillo v. Colvin*, 576 F. App'x 870, 876-77 (10th Cir. August 27, 2014) (unpublished))]. Significantly, however, whether the ALJ adequately accounted for Plaintiff's moderate limitations in concentration, persistence, or pace by restricting her to unskilled/simple work is only a secondary issue.   The primary issue that must be addressed on remand is whether the ALJ properly determined that Plaintiff's limitations in concentration, persistence, and pace were "moderate," as opposed to either "mild" or "marked."   This Court expresses no opinion on that issue.   Rather, since it is unnecessary for this Court to address issues that may be affected by the findings on remand, that issue will need to be addressed on remand during the adjudicator's global

reconsideration of the evidence and drafting of a detailed and specific RFC.   *See Robinson*, 366

F.3d at 1085 (declining to reach the plaintiff's step five claims because they may be affected by

resolution of the case on remand).

## C.   The ALJ's Credibility Assessment

Plaintiff also contends that the ALJ's assessment of her credibility was erroneous.   This

Court agrees that the ALJ's credibility assessment suffers from issues similar to the ones detailed

above regarding the SEP.   Specifically, the credibility assessment is largely not tied to specific

record evidence that indicates unreliability or deception.   For example, the activities the ALJ cites

as evidence that Plaintiff is less limited than she claims (*e.g.*, personal care, reading, cooking, and

a few household chores) are essentially "sporadic diversions," rather than activities that "establish

that a person is capable of engaging in substantial gainful activity."   *Byron v. Heckler*, 742 F.2d

1232, 1235 (10th Cir. 1984).   However, because this case must be remanded for further

proceedings, including a new and more detailed SEP, the issue of credibility is likely to be affected

by the treatment of the case on remand.   Therefore, the ALJ's credibility assessment, which is an

issue that is "peculiarly within the province of the finder of fact," anyway (*Kepler v. Chater*,

68 F.3d 387, 391 (10th Cir. 1995)), need not be addressed here.   *Robinson*, 366 F.3d at 1085.

Yet it is important to note that, on remand, the "findings as to credibility should be closely and

affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

*Armstrong*, 495 F. App'x at 894 (quoting *Kepler*, 68 F.3d at 391).

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for a proper sequential evaluation analysis that includes good and specific reasons, which are tied to record evidence, in support of factual findings.

**IT IS THEREFORE ORDERED** that Plaintiff's ***Motion to Reverse or Remand an Administrative Agency Decision*** (*Doc. 22*) is **GRANTED** and the Commissioner's decision in this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order**.**   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

_Lourdes a. Martinez_
**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**